UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:11CR358-W |
| | ) | |
| v. | ) | BILL OF INDICTMENT |
| | ) | |
| | ) | Violation: 18 U.S.C. § 2315 |
| NIDAL KHALED NASRALLAH | ) | 18 U.S.C. § 21 |
| a/k/a "MIKE NASRALLAH" | ) | |
| | ) | |

THE GRAND JURY CHARGES:

## INTRODUCTION

1. Beginning no later than December 9, 2010, and continuing to the present, in Mecklenburg Country, in the Western District of North Carolina and elsewhere, NIDAL KHALED NASRALLAH, defendant herein, did receive at least two-hundred and seventy-three (273) cases of a combination of Native and Philip Morris cigarettes he believed to have been stolen and taken by fraud by persons in the States of New York and Virginia, but who, unknown to the defendant, were in fact undercover law enforcement agents and officers (hereinafter "UCs"). The defendant purchased the cigarettes at prices far below their wholesale price. The defendant paid the UCs over $387,000 dollars in cash for the purportedly stolen cigarettes, which such prices were far below their wholesale price.

2. Native cigarettes are manufactured at the Mohawk Nation Territory in the State of New York. Philip Morris manufactures its cigarettes in Virginia. Once produced, the individual cigarettes are packaged into packs of twenty cigarettes each. Ten packs are then added together to make a carton of cigarettes. The cartons are then packaged into cases of sixty cartons each, which are referred to as a case of cigarettes.

3. Cigarette wholesalers obtain cigarettes from warehouses. Retailers purchase their cigarettes from wholesalers.

4. In and around November 2010, federal law enforcement authorities learned that NASRALLAH was interested in purchasing cigarettes at prices far below market wholesale value for resale in local stores in and around North Carolina. In 2010, the illegal sale of cigarettes was a recognized law enforcement problem because criminal organizations were known to obtain cigarettes by theft and fraud, including hijacking tractor trailer loads of cigarettes. The stolen cigarettes would then be sold to retailers at a considerable discount and then sold to consumers for huge profits.

5.   In December 2010, a UC told NASRALLAH that he could sell him eight cases of stolen cigarettes for $8,640. The UC explained to NASRALLAH that he acquired the cigarettes by "ripping" them—meaning stealing them from trucks—from New York. NASRALLAH understood that the cigarettes stolen from New York would be transported across states lines into North Carolina.

6.   On or about December 9, 2010, the UC sold NASRALLAH eight cases of "stolen" Native cigarettes in Pineville, North Carolina, for $8,640 in cash, which is 80% of the market wholesale price of the cigarettes. NASRALLAH asked the UC whether he would be able to get more cigarettes the next time.

7.   On or about December 28, 2010, the UC sold NASRALLAH ten cases of "stolen" Native cigarettes in Charlotte, North Carolina, for $10,800 in cash, which is 80% of the market wholesale price of the cigarettes. The UC told NASRALLAH that the cigarettes he was purchasing were stolen from New York. NASRALLAH asked about purchasing Marlboro (Philip Morris) cigarettes which were also in the van but not sold to NASRALLAH. The UC told NASRALLAH that he would sell a case of "stolen" Philip Morris cigarettes for $1,500. NASRALLAH indicated that he would purchase the cigarettes if the UC could obtain more.

8.   On or about January 13, 2011, the UC sold NASRALLAH twelve cases of "stolen" cigarettes in Pineville, North Carolina, for $13,800 in cash, which is approximately a little less than 50% of the market wholesale price of the cigarettes. The UC told NASRALLAH that the five cases of Native Full Flavor King Soft and five cases of Native Full Flavor 100 Soft cigarettes he was purchasing were stolen from New York. The UC told NASRALLAH that the two Marlboro Gold Pack cases were stolen from Virginia. After the deal, NASRALLAH advised that he could purchase thirty to forty cases of cigarettes in future deals.

9.   On or about January 21, 2011, the UC advised NASRALLAH in a phone conversation that they "hit" (meaning robbed) a truck carrying cigarettes in Virginia and were going to let the shipment sit for a week or so to "cool off." The UC told NASRALLAH it would take probably two weeks until they would be able to get the truck down to North Carolina and break down the load. The UC told NASRALLAH that he should have at least a pallet of Philip Morris cigarettes for him and maybe a little more.

10.   On or about February 4, 2011, the UC sold NASRALLAH forty-one cases of "stolen" cigarettes in Charlotte, North Carolina, for $58,980 in cash. The cases included six cases of Native cigarettes and 35 cases of Philip Morris cigarettes. After NASRALLAH provided the payment to the UC, the UC told NASRALLAH that they caught a little "heat" up in Virginia and that these cigarettes were stolen from a truck in Virginia. NASRALLAH advised that he could purchase fifty cases at a time.

11.   On or about February 9, 2011, the UC advised NASRALLAH in a phone conversation that he did not have any product available this week. The UC told NASRALLAH that it would be a couple of weeks before product became available because they were going to try to hit a large truck and steal a couple hundred cases out of Virginia. The UC stated that he would call NASRALLAH when he had the product to sell.

12. On or about March 2, 2011, the UC told NASRALLAH in a phone conversation that he got a good "lick" and got about four hundred cases of Philip Morris cigarettes on a truck. The UC told NASRALLAH he was willing to sell him half of the cigarettes. NASRALLAH said he would check with his people and call the UC back in a couple of days.

13. On or about March 11, 2011, the UC sold to NASRALLAH nine cases of "stolen" Native cigarettes in Pineville, NC, for $9,720 in cash. After the deal, NASRALLAH told the UC that he could purchase sixty-seven cases of cigarettes. The parties agreed to a deal for sixty-seven cases of cigarettes later in the month.

14. On or about April 7, 2011, the UC sold to NASRALLAH sixty-seven cases of "stolen" Philip Morris cigarettes in Pineville, North Carolina, for $100,500 in cash, which is approximately 62.846% of the market wholesale price of the cigarettes. During the deal, the UC told NASRALLAH that when they "hit" a truck they do not know how many cigarettes are going to be in there. The UC also provided NASRALLAH with a 32-inch flat screen HDTV. The UC told NASRALLAH that they do not just get cigarettes and that his "boys" also hit a UPS truck. The UC advised NASRALLAH not to pawn the HDTV.

15. On or about July 29, 2011, the UC sold to NASRALLAH one-hundred and two cases of "stolen" Philip Morris cigarettes in Pineville, NC, for $149,000 in cash. During the deal, the UC told NASRALLAH that he and his crew had some trouble in Virginia when they broke into a storage facility to steal the cigarettes and a security guard shot at them. The UC explained that he reduced the price of two of the cases since they were damaged by bullet holes. The UC told NASRALLAH that ten to twelve cases were damaged by bullets in total, but that NASRALLAH would only receive two damaged cases. The UC stated to NASRALLAH that they also stole a truck carrying cigarettes in Virginia, but they had to leave it there because they felt they were being watched. The UC told NASRALLAH he was holding an extra twenty cases of "stolen" cigarettes to sell to NASRALLAH early the next week.

16. On or about August 3, 2011, the UC sold to NASRALLAH twenty-four cases of "stolen" Philip Morris cigarettes in Charlotte, NC, for $36,000 in cash. That day, the UC told NASRALLAH that they were getting too much "heat" in Virginia and were going to get cigarettes from another State.

## COUNTS ONE through EIGHT

17. Paragraphs 1 through 16 of the Introduction to this Bill of Indictment are hereby realleged and incorporated into Counts One through Eight by reference herein.

18. On or about the dates listed below for each of Counts One through Eight, in the Western District of North Carolina and elsewhere, the defendant,

**NIDAL KHALED NASRALLAH,**
**a/k/a "MIKE NASRALLAH,"**

did receive, possess, conceal, store, barter, sell, and dispose of certain goods he then believed to have been stolen based on the representation of an undercover law enforcement agent, that is Native and/or Philip Morris cigarettes, of a value of $5,000 or more, which goods they believed had crossed a State boundary after having been represented as stolen, said goods represented as being in or near the Mohawk Nation Territory in the State of New York or Richmond, Virginia on a date preceding the date alleged in each of Counts One through Eight and subsequently brought into the State of North Carolina, believing the same to have been stolen.

| COUNTS | Date Received | LOCATION RECEIVED | No. of CASES | Wholesale Value |
|---|---|---|---|---|
| ONE | 12/9/2010 | Pineville, NC | Native 8 | $10,800 |
| TWO | 12/28/2010 | Charlotte, NC | Native 10 | $13,500 |
| THREE | 1/13/2011 | Pineville, NC | Native 10<br>Philip Morris 2 | $13,500<br>$4,540.80 |
| FOUR | 2/4/2011 | Charlotte, NC | Native 6<br>Philip Morris 35 | $8,100<br>$79,464 |
| FIVE | 3/11/2011 | Charlotte, NC | Native 9 | $12,150 |
| SIX | 4/7/2011 | Pineville, NC | Philip Morris 67 | $152,116.80 |
| SEVEN | 7/29/2011 | Pineville, NC | Philip Morris 102 | $237,088.80 |
| EIGHT | 8/3/2011 | Pineville, NC | Philip Morris 24 | $55,785.60 |

All in violation of Title 18, United States Code, Sections 2315 and 21.

### NOTICE OF FORFEITURE AND FINDING OF PROBABLE CAUSE

1. Notice is hereby given of the provisions of 18 U.S.C. §§ 981 and 982, 21 U.S.C. § 853, and 28 U.S.C. § 2461(c). Under section 2461(c), criminal forfeiture is applicable to any offenses for which forfeiture is authorized by any other statute, including but not limited to 18 U.S.C. § 981 and all specified unlawful activities listed or referenced in 18 U.S.C. § 1956(c)(7), which are incorporated as to proceeds by section 981(a)(1)(C). The defendants have or had a possessory or legal interest in the following property that is subject to forfeiture in accordance with sections 981, 982, 853, and/or 2461(c):

    a. all property which constitutes or is derived from proceeds traceable to the violations alleged in this Bill of Indictment;

    b. all property involved in the violations alleged in this Bill of Indictment;

    c. all property used or intended to be used to commit the violations alleged in this Bill of Indictment;

    d. in the event that any property described in (a), (b), or (c) cannot be located or recovered or has been substantially diminished in value or has been commingled with other property which cannot be divided without difficulty, all other property of the defendants, to the extent of the value of the property described in (a), (b), and (c).

2.  The Grand Jury finds probable cause to believe that the following properties are subject to forfeiture on one or more of the grounds stated above:

   a. all currency and monetary instruments constituting or derived from proceeds traceable to the offenses alleged in this Bill of Indictment, including but not limited to the sum of approximately $587,096 as a forfeiture money judgment; and

   b. $49,340 attributable to the purchase of 45 cases of cigarettes.

A TRUE BILL:

ANNE M. TOMPKINS
UNITED STATES ATTORNEY

*[signature]*
JENNIFER LYNN DILLON
ASSISTANT UNITED STATES ATTORNEY